# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on briefs on February 29, 2012

## STATE OF TENNESSEE v. BRUCE D. MENDENHALL

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-D-2738      Steve Dozier, Judge**

---

**No. M2010-02080-CCA-R3-CD - Filed February 4, 2013**

---

Defendant, Bruce D. Mendenhall, was indicted by the Davidson County Grand Jury for first degree premeditated murder, and he was convicted as charged following a jury trial. The trial court sentenced Defendant to life in prison. Defendant appeals his conviction and sentence and submits the following issues for our review: (1) whether the trial court erred by refusing to suppress evidence obtained from Defendant's person, his truck, and his tractor trailer as a result of Defendant's initial encounter with police Sgt. Postiglione, which Defendant asserts was a seizure not supported by reasonable suspicion; (2) whether the trial court erred by refusing to suppress Defendant's statements to police officers; (3) whether Defendant's statements to a fellow inmate should have been suppressed; (4) whether the trial court erred by admitting evidence that Defendant solicited another person to kill three potential witnesses; (5) whether the trial court erred by denying Defendant's motion to exclude portions of Defendant's phone calls recorded while Defendant was incarcerated; (6) whether the trial court erred by denying Defendant's motion to present testimony from a ballistics expert at trial; (7) whether the trial court erred by admitting into evidence items recovered from Defendant's truck; (8) whether the trial court erred by admitting into evidence photographs of the victim's body; (9) whether the evidence is sufficient to support Defendant's conviction; and (10) whether the trial court erred by ordering Defendant's sentence to run consecutively to a previously imposed sentence. After a careful review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JERRY L. SMITH and ROGER A. PAGE, JJ., joined.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher, Assistant Public Defender; Melissa Harrison, Assistant Public Defender; and Jason Gichner, Assistant Public Defender, Nashville, Tennessee, for appellant, Bruce D. Mendenhall.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; Tom Thurman, Assistant District Attorney General; Rachel Sobrero, Assistant District Attorney General; and Pam Anderson, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

*Background*

The victim in this case, Sara Hulbert, was found dead at the Truck Stops of America truck stop in Nashville in the early morning hours on June 26, 2007. On July 12, 2007, Defendant was arrested, and he was later indicted for first degree premeditated murder. While Defendant was in custody for the murder of Ms. Hulbert, he was charged with five counts of solicitation to commit first degree murder. Defendant was tried and convicted of three counts of solicitation in that case, and this court affirmed Defendant's convictions on appeal. *State v. Bruce D. Mendenhall*, No. M2010-01381-CCA-R3-CD, ___ WL ___ (Tenn. Crim. App. at Nashville, filed Jan. 30, 2013).

*Suppression Hearings*

Defendant filed a motion to suppress the following evidence at trial: (1) all statements made by Defendant to police on July 12, 2007; (2) all items seized from Defendant's truck and tractor trailer on July 12, 2007; and (3) all items seized from Defendant's person on July 12, 2007. Because Defendant's solicitation case contained identical suppression issues, the November 9, 2009 suppression hearing in that case was incorporated into the proceedings in this case and is included in the record before us.

At the pretrial suppression hearing in Defendant's solicitation case, Sgt. Ray Postiglione, of the Metro Nashville Police Department, testified that he had worked in the homicide unit since 1987. He was the supervisor of the investigation of Sara Hulbert's murder. On July 12, 2007, he and lead detective Lee Freeman went to the crime scene at Truck Stops of America on North 1st Street in Nashville to review fuel receipts from June 25 and 26, 2007. As he turned onto North 1st Street, Sgt. Postiglione saw a yellow tractor trailer that was similar to the truck he had seen in a video of the area taken around the time that the crime occurred; however, he testified, there was no identifying information about the truck seen in the video except that he noticed "some sort of a design on it." He followed the

truck in his unmarked vehicle. The truck circled the block and returned to North 1st Street headed back toward the truck stop. The truck then parked at the truck stop, and Sgt. Postiglione called Detective Freeman and told him that he "was going to approach the driver and just try and speak with him and have a conversation with him."

Sgt. Postiglione parked behind Defendant's truck. When Sgt. Postiglione got out of his vehicle, he saw the curtains on the driver's side immediately close. He then approached the driver's side and knocked on the door, but there was no response. He knocked again and the curtain opened and Defendant "was looking down at [him]." Sgt. Postiglione asked Defendant if he would mind getting out of the truck and speaking to him, and Defendant agreed. Sgt. Postiglione identified himself and showed Defendant his badge. Sgt. Postiglione testified that he and Defendant had "a casual conversation." He testified that Defendant was not wearing shoes, and Defendant told him that he had been asleep. Sgt. Postiglione asked Defendant for identification, and Defendant produced his Illinois driver's license. Defendant stated that the last time he had been to Nashville was in May, 2007.

Sgt. Postiglione noticed "a few drops of blood" on the driver's side door and "what appeared to be blood" on Defendant's left thumb. He asked Defendant if he would submit a DNA sample, and Defendant consented. Sgt. Postiglione asked if he could look inside Defendant's truck. Defendant asked Sgt. Postiglione if he was going to "tear the truck up." When Sgt. Postiglione answered that he would not, Defendant "motioned with his hand to go ahead." Sgt. Postiglione asked Detective Freeman for a consent to search form. Detective Freeman went to his car and brought back a consent to search form and a DNA consent form. The DNA consent form shows that Sgt. Postiglione signed the form at 10:20 a.m., and Defendant also signed the form. Sgt. Postiglione testified that he saw Defendant sign the form before Detective Freeman collected a DNA sample from Defendant. Defendant also signed a consent to search form, which was noted to have been filled out at 10:25 a.m. Sgt. Postiglione did not sign the consent to search form. He testified that "[t]he only time [he] got into [Defendant's] truck was after [Defendant] gave [him] verbal permission. And then [Defendant] signed a consent to search."

Inside Defendant's truck, Sgt. Postiglione noticed a large trash bag behind the driver's seat. He looked inside the bag and noticed "what appeared to be blood soaked items." He asked Defendant about the blood, and Defendant stated that he had cut his leg getting out of the truck. Sgt. Postiglione asked to see Defendant's cut, and Defendant pulled up his pant leg, but Sgt. Postiglione did not see a visible cut, scab, or scar. He told Defendant that the blood appeared to be wet, and Defendant "just had no explanation for that." Sgt. Postiglione then got back into the truck to look inside the bag a second time and saw that the items appeared to be female clothing and shoes. He asked Defendant whether any females had

-3-

been in his truck, and Defendant responded that his wife and daughter rode with him, but Defendant was not able to describe their clothing.

At some point, Defendant got inside the truck while Sgt. Postiglione was inside. Defendant told him "that the blood actually came from a prostitute in Indianapolis who cut her hand." While inside the truck, Sgt. Postiglione also noticed a pair of black shoes. He looked at the treads and believed that they appeared to be similar to the tread markings found at the crime scene. Sgt. Postiglione showed the shoes to Detective Freeman, and Detective Freeman agreed that the treads looked similar. Sgt. Postiglione testified that he asked Defendant twice if his truck was the truck they had "been looking for" and if he was the person they had "been looking for," and Defendant shrugged his shoulders and said, "[I]f you say so."

Sgt. Postiglione testified that Defendant initially denied that there were any weapons inside the truck, but he later admitted that there was a .22 caliber rifle. "With all that information," Sgt. Postiglione directed Detective Freeman to take Defendant into custody. At that point, Sgt. Postiglione stopped searching Defendant's truck because he did not want to "contaminate the scene." Sgt. Postiglione decided to have the truck taken to the TBI. While they were waiting for a car to transport Defendant, Defendant sat in the front passenger seat of Sgt. Postiglione's unmarked car because it was hot and Defendant had stated that he was diabetic. Sgt. Postiglione testified that he believed that Defendant was handcuffed. He testified that he engaged Defendant in "small talk," but he did not ask him anything about his arrest. Sgt. Postiglione testified that Defendant had not been advised of his *Miranda* rights. He testified that they engaged in "just typical small talk, hot day. I mean, that type of thing, just nothing – nothing unusual."

While in Sgt. Postiglione's car, Defendant stated to him that "he was pissed off at [Richie] and David" and that "they did all the killings." Defendant "made other statements about [how] he displayed the victim [there] so [they] could find her[,]" and "[h]e said the blood inside the bag belongs to a girl they killed up in Indianapolis." Sgt. Postiglione testified that Defendant "made some other incriminating statements." Sgt. Postiglione asked Defendant if he would give a statement to the police and Defendant agreed. Sgt. Postiglione testified that he did not ask Defendant any questions other than to ask whether he would be willing to give a statement.

Another officer arrived to transport Defendant, and Defendant was placed in the backseat without handcuffs. Defendant was taken to General Hospital before being transported to the police station because he told Sgt. Postiglione that he had diabetes and was feeling sick. Sgt. Postiglione testified that Defendant was checked out and "he was fine." At the police station, Sgt. Postiglione interviewed Defendant. Before the interview, he

advised Defendant of his *Miranda* rights, and Defendant signed a written waiver. A video recording of the interview was admitted as an exhibit at the suppression hearing. Sgt. Postiglione testified that Defendant stated in the interview that other people had killed the victims using Defendant's weapon and that they sometimes left the victim in his truck, and other times, they would remove the victim from his truck and Defendant cleaned up the blood. Defendant stated that in this case, he laid the victim down "in a displayed fashion" for police to find and that he wanted the police to find the real killers of the victims.

On cross-examination, Sgt. Postiglione acknowledged that if Defendant had wanted to drive away from where he was parked, "Detective Freeman's car might've been in the way inadvertently." He testified that he was wearing a holstered gun. He testified that after he looked at Defendant's leg and saw that there did not appear to be a cut, Defendant stated that a prostitute in Indianapolis had cut her hand inside the truck. After Defendant made that statement, he asked Sgt. Postiglione if he was under arrest, and Sgt. Postiglione told him that he was not. Defendant then asked Sgt. Postiglione if he needed a lawyer, and Sgt. Postiglione told him that he could not advise him about that.

Detective Lee Freeman was assigned to be the lead investigator in this case. He testified that he was at the truck stop on July 12, 2007, waiting for Sgt. Postiglione to arrive when Sgt. Postiglione called him to say that he was following the truck from the video of the truck stop taken on the night of the murder. When Defendant parked his truck at the truck stop, Detective Freeman parked behind Defendant's truck on the "[b]ack left-hand side." Detective Freeman testified that he was parked "enough [to the side] that if [Defendant] would've backed up he wouldn't've [sic] run over [his] car." Detective Freeman heard Defendant tell Sgt. Postiglione that the last time he had been in Nashville was in May. Detective Freeman showed Defendant two consent forms, one to obtain a DNA sample and another to search his truck, and buccal swabs. He explained to Defendant that he could refuse consent to either or both, but he did not read the forms "verbatim" to Defendant. Defendant signed both consent forms. Detective Freeman did not recall whether Defendant asked him any questions. While Sgt. Postiglione was inside Defendant's truck, Detective Freeman asked if Defendant wanted to sit in his air-conditioned car, but Defendant declined. Sgt. Postiglione showed Detective Freeman a pair of black tennis shoes and asked if the soles looked familiar, and Detective Freeman agreed that they did. Sgt. Postiglione then went back into the sleeper area for "maybe a couple more minutes," and then leaned forward again and told Detective Freeman to take Defendant to his car. Defendant stepped down from the truck steps, and Detective Freeman put handcuffs on him, walked him to the trunk of his car, and patted Defendant down for weapons.

Detective Hugh Coleman arrived shortly thereafter. Detective Freeman left to obtain a search warrant in the event that Defendant revoked his consent to search his truck. When

he later "called down to the scene," he was told that Defendant had been taken to General Hospital, and Defendant's truck had been towed to the TBI.

In a written order denying Defendant's motion to suppress, the trial court made several findings of fact. The court found that Sgt. Postiglione did not activate his emergency lights or siren when he followed Defendant's truck, and thus, the court concluded that Defendant was not seized for Fourth Amendment purposes; however, the court found that when Sgt. Postiglione took Defendant's driver's license and did not return it, that constituted a seizure. The court concluded that the "initial interaction between Sgt. Postiglione and the Defendant was an investigatory detention – a seizure for Fourth Amendment purposes." The court further found that Sgt. Postiglione had a reasonable suspicion sufficient to justify Defendant's detention because Sgt. Postiglione saw a semi-truck that resembled a truck seen in the surveillance video taken at the truck stop on the night of the victim's murder pull into the truck stop where the murder occurred three weeks prior.

The trial court also concluded that although it was "clear that Sgt. Postiglione 'interrogated' the Defendant for Fifth Amendment purposes[,]" while the Sgt. Postiglione searched Defendant's truck, the court determined that Defendant was not in custody prior to his arrest. The trial court found that it was "beyond dispute" that Defendant was in custody while he and Sgt. Postiglione were seated inside Sgt. Postiglione's vehicle; however, the court accredited Sgt. Postiglione's testimony that Defendant's statements about the crime were not solicited and concluded that Sgt. Postiglione did not interrogate Defendant. Finally, the trial court concluded that the detectives' interview of Defendant at the police station did not violate *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, (2004) (held that post-*Miranda* statements may be inadmissible when *Miranda* warnings are read after a custodial interrogation begins), because Defendant had not been subjected to a custodial interrogation in Sgt. Postiglione's car, and therefore, the two interactions were not part of the same continuing interrogation. The court concluded that Defendant's statements to detectives at the police station were knowing and voluntary.

*Trial*

Defendant's trial began on May 10, 2010. The victim's sister Roxanna Wayman testified that Ms. Hulbert had a history of drug and alcohol addiction, and Ms. Wayman was aware that Ms. Hubert was engaging in prostitution at the time of her death.

Nicholas Turner, the head of security at the Travel Centers of America truck stop in Nashville, testified that he discovered the victim's body in the early morning hours on June 26, 2007. Mr. Turner found the body at approximately 12:50 a.m. He checked to see if the victim was breathing and "didn't see anything so [he] called 911." He estimated that the first

police officer arrived approximately thirty seconds to one minute after he made the emergency call. On cross-examination, Mr. Turner testified that he was training another security officer that night. The officer, Robert Nelson, left at approximately 12:15 a.m. Mr. Turner "had him basically tail [him] on [his] duties . . . ." While walking with Mr. Nelson around the truck stop, Mr. Turner showed Mr. Nelson a hole in a fence near where the body was found. Mr. Turner testified that prostitutes and drug dealers would enter the property through the hole in the fence. Mr. Turner testified that he had last checked the area where the victim's body was found at approximately 12:15 or 12:20 a.m., and he had not seen the body there.

Sgt. Robert Durbin was patrolling the area of downtown Nashville on June 26, 2007. At approximately 1:00 a.m., he was dispatched to the Truck Stops of America in response to a dead body. When he arrived, he met with private security officer Nicholas Turner, who took Sgt. Durbin to the area where the body was discovered behind some parked trailers. Sgt. Durbin testified that "it was plainly apparent to [him] that [Ms. Hulbert] was deceased." She was naked and had "blood all over her head." She was lying on her back and her feet were positioned with the soles together and her knees spread apart. Her left hand was stretched out beside her with her wrist turned up. She was wearing an ID bracelet, and the name on it was clearly visible.

Sgt. Stephen Beck of the Metro police department arrived at the crime scene after Sgt. Durbin. Sgt. Beck noticed "some blood droplets" on the ground between two trailers. He also saw a "muddy area outside of the trailer going towards the area [where the body was found] and there was a footprint in there . . . ." Sgt. Beck testified that the footprint "seemed out of place as there were no other footprints in and around the area."

Officer Tim Matthews looked in several trash barrels around the truck stop, searching for weapons, women's clothing, anything with blood on it, or any plastic similar to the plastic found under the victim's head, but he did not find anything. He also searched under the trailers.

Lt. Frank Regans was the supervisor of the crime scene. He worked in the identification unit. Lt. Regans took two castings of two different shoe prints found in the area of the victim's body.

Officer Charles Linville testified that the victim's face and head were bloody. There was also blood on the victim's feet. She also had scratches and bruises. He collected swabs from the victim's chest area, thigh area, and stomach.

Lee Meeks saw the victim in the evening on June 25, 2007. Mr. Meeks, the victim, and a man named "Hollywood" were "just riding around using drugs" in Hollywood's van. Hollywood stole "six to eight cases" of beer and sold the beer. They used the money from selling beer to buy "crack." At approximately 10:20 to 10:30 p.m., they parked near the truck stop. Approximately 45 minutes after they arrived, the victim left the van. Mr. Meeks thought the victim was going to walk to White's Front Market to meet "her old man Derrick." The last time Mr. Meeks saw the victim she walked between two parked trucks. The victim did not return to the van. Mr. Meeks and Hollywood left at approximately 1:30 a.m. Mr. Meeks testified that he did not contact the police when he learned that the victim had been killed because he had a criminal record. He was interviewed by the police while he was incarcerated for vandalism, and he agreed to submit a DNA sample.

Joseph Uhlir, a retired truck driver, had parked for the night at the truck stop in Nashville. He testified that he arrived "roughly maybe about 11:00 to the 12:00 midnight frame roughly." He "backed [his] rig" into a parking spot in the back where it was "kind of secluded." He noticed another truck park beside him. He testified that it drove in "faster in [his] opinion than normal." He also thought it was unusual that the truck parked in the opposite direction as his truck. He testified that the truck was also blocking another truck to its left. Mr. Uhlir radioed the truck beside him to tell him that he was blocking another driver, and the driver stated that he was "not going to be [t]here that long." Mr. Uhlir finished working on his logbook, listened to the radio "just for a little bit," and "climbed in the back and tr[ied] to get some rest." He then heard the engine of the truck beside him. The engine got "louder and louder." Mr. Uhlir looked out of his window to make sure the truck did not collide with his truck while reversing, and the headlights blinded him. Mr. Uhlir testified that he "thought the tractor was white," but that "it could have been a light yellow color[,] too . . . ." He testified that the other truck was at the truck stop for less than half an hour.

Medical examiner Feng Li performed an autopsy on the victim. The victim was 25 years old at the time of her death. She died from a gunshot wound on the back right side of her head. The projectile was still in the victim's head, and based on the location of the bullet, Dr. Li determined that the victim was shot from behind and at a downward trajectory. The wound was consistent with a "close range gunshot wound" because there was soot material around the entrance wound. Dr. Li testified that the victim "would have died instantly" from the gunshot. The victim also had an abrasion caused by some type of blunt object near the gunshot entrance wound. Dr. Li testified that the victim had "multiple blunt force injuries" and other cuts and abrasions. Dr. Li described the victim's other injuries. She had bruises and contusions around her left eye, nose, and forehead and around her neck and chest. She had superficial cuts on her hands. Dr. Li testified that the victim's injuries could have been inflicted by a nightstick. Dr. Li testified that the victim also had a laceration of the anus,

which he testified was inflicted at the time of death or after the victim's death. The victim also had contusions around her genitalia. Dr. Li testified that those injuries were caused by blunt force and could have been caused by an erect penis. Dr. Li testified that the victim had a "large area of skin defect on the right buttock area," which Dr. Li testified could have been caused by a razor. The wound was approximately two inches by two and a half inches and was likely caused at the time of death or after death. Dr. Li collected a rape kit and DNA swabs from the victim's body.

Sgt. Postiglione testified that he viewed the videotape recordings obtained from the truck stop and two neighboring businesses and developed a suspect vehicle. On July 12, 2007, he and Detective Lee Freeman went to the truck stop to "locate some fuel tickets." As he drove towards the truck stop, Sgt. Postiglione observed a yellow tractor trailer similar to the truck he had observed in the video drive past the truck stop. Sgt. Postiglione followed the truck around the block and into the truck stop, where the truck parked in the parking lot. Sgt. Postiglione approached the driver's side of the truck and "banged on the door." There was no response, and he noticed the curtains had been pulled closed. He "banged on the door a second time[,]" and Sgt. Postiglione saw the curtain open and saw Defendant "looking down" at him. Sgt. Postiglione showed his identification and asked to speak to Defendant, and Defendant exited the truck. Defendant's shirt was "all the way opened[,]" and he was not wearing shoes. Sgt. Postiglione testified that Defendant "was making motions like he had just woken up like he had been asleep." Sgt. Postiglione explained that he was looking for a vehicle similar in description to his, and they "had a little brief discussion." Sgt. Postiglione then asked Defendant if he would submit DNA samples, and Defendant consented. Defendant also provided Sgt. Postiglione with his Illinois driver's license. Detective Freeman took DNA samples from Defendant.

Sgt. Postiglione noticed what "appeared to be blood drops on the driver's door, several blood drops." He asked to search Defendant's truck, and Defendant consented. Sgt. Postiglione stepped into the truck and "sat on the back mattress." He noticed a bag between the driver's seat and the bed, and he looked inside. He saw what appeared to be bloody clothing. He asked Defendant if he could explain the contents of the bag, and Defendant told him that he had cut his leg getting in and out of his truck and that he would "wipe the blood and then place it in the bag." Sgt. Postiglione asked Defendant to show him the cut. Defendant pulled up his pants leg, but Sgt. Postiglione testified that he saw no cuts, scabs, or scars on Defendant's leg. He testified, "Defendant couldn't explain it any further."

Inside the truck, Sgt. Postiglione also saw a pair of black shoes. He picked them up and noticed that the tread pattern was similar to the tread pattern of a footprint found near the victim's body. He showed Detective Freeman the shoes and asked if he thought it looked similar, and Detective Freeman agreed that it did. Sgt. Postiglione testified that, prior to

-9-

getting in the truck, he asked Defendant if he had a weapon in the truck, which Defendant denied. Sgt. Postiglione testified that he asked Defendant, "is this the truck [they]'ve been looking for[,]" and Defendant "shrugged his shoulders . . . ." Sgt. Postiglione testified that he asked again if it was "the truck [they]'ve been looking for[,]" and Defendant shrugged his shoulders again. Sgt. Postiglione then asked Defendant if he was "the person [they'd] been looking for[,]" and Defendant "just looked at [him] and he shrugged his shoulders." Defendant then responded, "[I]f you say so." Sgt. Postiglione then asked Defendant again if there was a weapon inside the truck, and Defendant admitted that he had a .22 caliber gun inside. Sgt. Postiglione testified that he knew that the victim was killed with a .22 caliber gun. Sgt. Postiglione placed Defendant under arrest, and Defendant was taken to General Hospital to be examined and then taken to police headquarters. At the headquarters, Sgt. Postiglione advised Defendant of his *Miranda* rights, and Defendant agreed to give a statement.

In a videotaped statement, Defendant is seated across the table from Sgt. Postiglione and Detective Freeman in a small interview room. Sgt. Postiglione read Defendant's rights to him, and Defendant answered affirmatively that he understood his rights. Defendant then stated that he had stopped at the Pilot truck stop and "fueled up" when David Powell and Richie Keim approached him. Defendant stated that "they walked up" and asked, "Where're you going now?" Defendant told the men that it was "none of [their] business," and the men stated that it was "[their] business now." Defendant stated that David rode with him in his truck to the TA truck stop, and Richie followed in another vehicle. Defendant thought there was a third person in the vehicle. Defendant went inside the TA to get something to eat. When he returned to his truck, the victim "was sprawled out in the back." The men told Defendant, "It's your problem, not ours," and left. Defendant then "proceeded to clean the mess up." Defendant stated that the victim was not wearing any clothes, and there were "bags over her head." He stated that "there was blood everywhere." Defendant told detectives that he had a .22 caliber rifle in his truck and that he believed the victim was shot with his rifle. He stated that the men "meet [him] everywhere." He did not know how the men knew where he was. He "dumped her body" behind the truck trailers at the truck stop. He stated that he displayed her body "in plain view." He stated that the men "were laughing about" having had sex with the victim. When Sgt. Postiglione asked Defendant if the victim had been cut, Defendant stated that the men had told him that "she had a good tattoo." Sgt. Postiglione had not mentioned that the victim had a tattoo. Defendant's demeanor while giving the statement appeared calm.

Sgt. Postiglione subsequently located and interviewed Mr. Keim, Mr. Powell, and Mr. Sanders and obtained their fingerprints and DNA samples. Sgt. Postiglione testified "[t]here was no[t] – one shred of evidence suggesting any of these individuals were involved."

Detective Freeman testified that he reviewed the video recordings obtained from the truck stop and neighboring businesses and developed a suspect vehicle. That truck drove to the back area of the truck stop and parked during the relevant time frame. The truck left "within a certain amount of time without doing anything else, going to the gas pumps or anything else." Detective Freeman also corroborated Sgt. Postiglione's testimony about the detectives' initial encounter with Defendant.

Lori Young, who is Richie Keim's mother, testified that Mr. Keim has Asperger's disease and schizophrenia. She testified that Mr. Keim is "wholly disabled" and cannot testify, enter into legal agreements, or drive a vehicle. In June, 2007, Mr. Keim was living with Ms. Young in Franklin, Kentucky. She testified that he was not able to leave without her supervision. Ms. Young testified that it was not possible that Mr. Keim left Kentucky and went to Tennessee without her knowledge. When officers investigating the case came to talk to her, she allowed them to take a statement and DNA from Mr. Keim.

Ms. Young testified that she met Defendant in 2002 when her truck broke down in Maryland, and she "received a ride from a truck driver or two" until she got to her home in Arizona. She testified that she rode in Defendant's truck for "[t]wo, maybe three" days. Defendant offered to rent a house to Ms. Young, and she lived in that house for "[t]wo and a half to three months" before she moved out. She saw Defendant "[m]aybe once at the bowling alley but [she] didn't speak to him[,]" and that was the last time she saw Defendant.

Terry Wayne Sanders, II, testified that he lived in Elwood, Indiana. He testified that he had spoken to Defendant on two separate occasions in 2001. The first time he spoke to Defendant was after Mr. Sanders and some friends had "vandalized his house" by wrapping toilet paper and plastic wrap around Defendant's trees and front porch. Mr. Sanders was 15 years old at the time. Defendant confronted Mr. Sanders. Mr. Sanders later dated Defendant's niece and talked to Defendant one other time in the fall of 2001. Mr. Sanders was in Albuquerque, New Mexico, on June 25, 2007, because his mother had been involved in a car accident. Mr. Sanders' niece and grandmother were killed in the accident. Mr. Sanders arrived in Albuquerque on June 22, 2007, and returned to Indiana on July 2, 2007.

Danny Davis was Defendant's employer through his small trucking firm at the time of Defendant's arrest. Mr. Davis testified that Defendant had worked for him for approximately one year at the time of Defendant's arrest. Mr. Davis recalled a conversation between Defendant, Defendant's wife, Mr. Davis, and Mr. Davis's wife, in which Mr. Davis asked Defendant "why he liked these big truck stops. . . ." Mr. Davis stated that "them lot lizards will be crawling all over your vehicle in the big truck stops." Mr. Davis testified that "lot lizards" is a slang term for prostitutes. Defendant's wife "smacked him on the shoulder and said, '[Y]ou better not be messing with any lot lizard.'" Defendant turned to Mr. Davis

and said, "I just shoot them." Mr. Davis "took it, you know, as a joke . . . and kind of laughed it off . . . ." Mr. Davis testified that company policy and the law prohibited drivers from having weapons inside their trucks. Mr. Davis testified that Defendant's fuel receipts showed that Defendant purchased fuel at a Pilot station in Nashville at 12:33 p.m. on June 25, 2007.

After being recalled to the witness stand, Sgt. Postiglione testified that he interviewed Lucas McLaughlin, a fellow inmate of Defendant. McLaughlin agreed to wear a wire and record his conversations with Defendant. Sgt. Postiglione instructed McLaughlin not to speak to Defendant about the homicide, but only the "solicitation case."

Two recorded conversations between McLaughlin and Defendant on May 2, 2008, and May 16, 2008, were played for the jury. In the first recording, Defendant told McLaughlin that he needed someone to be an alibi witness and testify that Defendant refused consent for Sgt. Posgitlione to search his truck. McLaughlin asked Defendant for Lori Young's address. Defendant told McLaughlin, "I would owe you dramatically[,]" and McLaughlin said, "Right, well my thing is, Lori goes away, you know[,]" to which Defendant replied, "[Y]eah." Defendant and McLaughlin discussed where to find Ms. Young, and McLaughlin said, "I'll blow the whole f[ ]ing house up. It's a gas leak." Defendant replied, "[w]hatever. You know that's your, that's your thing." McLaughlin stated that after Defendant's trial, they could "settle up." McLaughlin suggested that Defendant work for his uncle's trucking company and pay McLaughlin ten percent of his earnings, and Defendant agreed.

In the May 16, 2008, conversation between Defendant and McLaughlin, McLaughlin asked Defendant who "David" was and stated, "[I]f I'm gonna pop his ass, I need to know why." Defendant told McLaughlin that he was a friend of Richie and Lori. McLaughlin told Defendant, "I thought about it, and I'm just gonna do it how I'm gonna do it. It's a gas leak in the trailer, and everybody blows up. I'm happy. You're happy." McLaughlin stated that he wanted to know "who the David guy was and if, if he was that big of a threat [because] one thing I don't like doing is innocent bystanders." McLaughlin then asked, "[w]hat's one more explosion?" and Defendant replied, "Yep." McLaughlin asked Defendant if they were "still on" and whether Defendant would "pay [him] back." Defendant again replied, "Yep." McLaughlin said, "I'm thinking like roughly fifteen, fifteen thousand. And that's for the whole thing, everybody. And you go about your merry day. No witnesses show up for you." McLaughlin told Defendant that he would not contact him, and Defendant said, "[n]o connections. . . . [j]ust the number to your uncle's trucking company." McLaughlin told Defendant, "I ain't gonna do this, then you gonna wind up having remorse, or a guilty conscience or whatever." Defendant told McLaughlin to "do [his] thing" and stated, "I don't want to know." Defendant stated, "[t]he less I know, the better it is for you."

McLaughlin told Defendant, "if I blow up the trailer, and take out Lori and her son, I don't know his name," and Defendant stated, "Richie." McLaughlin then asked, "does David live there too?" Defendant answered "[n]ope" and told McLaughlin where David lived with his daughter. McLaughlin asked, "[d]oes she need to go?" and Defendant replied, "[n]ot really, no." McLaughlin asked Defendant if David, Lori, and Richie were "the only three that can hurt [Defendant]," and Defendant replied, "[y]ep." The following exchange then occurred:

> McLaughlin: Fifteen grand, I kill all three. After that, you don't know me until you come out, then you just call that phone number, talk to my uncle. My uncle will get you in touch with me. But other than that, we don't know each other.
>
> Defendant: Alright.
>
> McLaughlin: Is that a deal?
>
> Defendant: Yeah.

TBI Agent Steve Scott was qualified by the trial court as an expert in forensic firearms testing and ammunition testing. Agent Scott identified the rifle that was found inside Defendant's truck as a .22 caliber rifle. A .22 caliber cartridge was found in the top drawer of a storage compartment behind the driver's seat in Defendant's truck. Another .22 caliber cartridge case was found on the floor behind the passenger seat in the truck. A third shell casing was collected when the truck was processed for evidence, and a fourth shell casing was found on the floor of the passenger side of the truck.

Agent Scott also identified a nightstick that was found in a wooden drawer under the bed in Defendant's truck. He identified two pairs of shoes and two sets of handcuffs that were found in the truck. Black electrical tape was found in an outer storage compartment on the outside of the truck on the passenger side. A second roll of electrical tape was in a storage compartment above the dashboard. A yellow notepad found in the truck had notes that read, "go back TA" and "4-sex okay." A logbook indicated that Defendant was in Nashville on the afternoon of June 25, 2007. A box of cling wrap was found near the lower bunk in the sleeper portion of the truck.

Agent Scott examined a bullet recovered by the medical examiner from the victim's head and compared it to Defendant's rifle. He concluded that the bullet was fired from Defendant's rifle. Agent Scott also concluded that three of the four cartridge casings found inside Defendant's truck were fired from Defendant's rifle. The fourth casing did not have

enough individual characteristics for Agent Scott to conclusively identify it, but he could not exclude the casing from having been fired by the rifle. Agent Scott observed what appeared to be "blood staining in some of the cracks and crevices" of Defendant's rifle, but he did not test the stains to determine whether they were blood. He took swabs of the stains.

TBI Agent Linda Littlejohn was qualified by the trial court as an expert in the field of forensic testing of shoes and shoe prints. She testified that she compared a pair of Defendant's shoes with casts of two different shoe prints made at the crime scene. With respect to the cast of one of the shoe prints at the crime scene, Defendant's shoes "were consistent with size, shape and tread design so therefore they could have made that cast or another shoe just like it could have made that impression."

TBI Agent Kendra Fleenor was qualified by the trial court as an expert in the field of latent print comparison. She processed Defendant's truck and lifted latent fingerprints. She compared the fingerprints from the truck with those of Terry Sanders, David Powell, Richard Keim, the victim, and Defendant. None of the victim's prints were in Defendant's truck. The prints in the truck did not match Mr. Keim's, Mr. Powell's, or Mr. Sanders' prints. 25 of the prints taken from the truck matched Defendant's prints. Defendant's prints were found on a garbage bag and the .22 caliber rifle.

Agent Patrick Ihrie, of the DNA and serology unit, testified that semen was present in the victim's mouth, anus, and vagina, but the semen did not match Defendant's DNA profile. The semen also did not match the DNA profiles of Lee Meeks, Wayman "Hollywood" Henderson, or the victim's other previous boyfriends. The semen also did not match the DNA profiles of Richie Keim, David Powell, or Terry Sanders. Agent Ihrie was unable to obtain a DNA profile from semen found on the victim's thigh.

Agent Ihrie testified that he removed and processed several items from Defendant's truck. A utility knife with a removable razor blade and a "leather pouch to go with it" were recovered from the driver's side storage area. A second knife was found in "drawer number 3." "Sex toys" were also found in "drawer number 3." Agent Ihrie conducted DNA analysis from different areas of the sex toys. The DNA on the "tan device" that had what looked to be a "blood pressure inflating bulb on one end" was a mixture of male and female genetic material and did not match any samples from the known individuals. The DNA profile from the "red device" was also a mixture of male and female genetic material, and the "major contributor" was consistent with Defendant.

Agent Ihrie identified a knife found in the center console of Defendant's truck. He testified that the knife was tested, and it was determined that blood was present on the blade edge. Agent Ihrie obtained a DNA sample, but the profile was "very small," and it indicated

only that the DNA came from a female. Agent Ihrie also identified Defendant's DNA on the handle of the knife.

Two sets of metal handcuffs were processed for DNA, and the test indicated the presence of human DNA, but the sample contained a small amount of DNA, and a profile was not obtained. A penis pump was found in the lower bunk area of Defendant's truck. Plastic wrap was found in the cubby area behind the driver's seat and in the back floorboard.

Agent Ihrie tested and confirmed that several "reddish brown stains" in Defendant's truck were blood. Blood found on the door jamb area of the truck matched the victim's DNA profile. Two of the 13 genetic loci were inconclusive. However, the report concluded that the chance that the blood on the door jamb belonged to a person other than the victim was only one out of 23 *trillion*. A blood sample taken from inside the driver's side of the truck also matched the victim's DNA profile. Four genetic markers were inconclusive, but only one in 85 billion Caucasian people would have the same profile. Another blood sample was taken from the back of the driver's seat and tested. 13 out of 13 loci matched the victim's DNA profile, and the probability of an unrelated individual having the same profile was one out of 15 quadrillion people.

Agent Ihrie also examined reddish brown stains on Defendant's rifle. A blood stain on the "rear sight" matched the victim's DNA profile. Blood from the barrel where the "wooden part of the forearm and the barrel meet" also matched the victim's DNA profile, and Agent Ihrie testified there was a one in 1.4 trillion chance that it was someone other than the victim's DNA. Blood from "[n]ear the end of the barrel" also matched the victim's profile.

For the defense, TBI Agent Sandra Poltorak, an expert in the field of tire track comparison, testified that Defendant's tire tracks did not match any of the tire tracks found at the scene where the victim's body was found. She also testified that the "stance measurement" between the tire tracks found at the scene was inconsistent with the "stance," or distance between the two front tires, of Defendant's truck.

*Analysis*

**Suppression Issues**

The first seven errors that Defendant asserts on appeal involve suppression issues. Specifically, Defendant asserts in his brief that: (1) "the trial court erred in holding that [Defendant]'s initial detention was lawful. Therefore, all evidence derived from the search of the semi truck should have been suppressed[;]" (2) "the trial court should have suppressed

all evidence derived from the search of [Defendant]'s tractor trailer because such evidence would not have been discovered but for his illegal detention[;]" (3) "the trial court should have suppressed the evidence seized from [Defendant]'s person, as it was obtained as the result of his illegal detention, and in violation of his other constitutional rights[;]" (4) "the trial court should have suppressed all of [Defendant]'s statements to police because they were the fruit of his illegal seizure and interrogation[;]" (5) "the trial court should have suppressed all statements [Defendant] made to Roy McLaughlin because they were obtained in violation of his right to counsel and his protection against self-incrimination[;]" (6) "the trial court erred in allowing the State to introduce evidence that [Defendant] solicited Roy McLaughlin to kill Lori Young, David Powell, and Richie K[ei]m[;]" and (7) "the trial court erred by denying [Defendant]'s motion to exclude recordings of his phone calls from jail and prison."

"[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). We review a trial court's applications of law to the facts *de novo*, however. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). The party prevailing at the suppression hearing is further "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23.

For the purposes of this appeal, we will consolidate Defendant's first three issues and address them collectively because they all hinge on the legality of Sgt. Postiglione's encounter with Defendant at the truck stop on July 12, 2007. The identical issues were also reviewed on appeal in *State v. Bruce D. Mendenhall*, No. M2010-01381-CCA-R3-CD, ___ WL ___ (Tenn. Crim. App. at Nashville, filed Jan. 30, 2013), in which this court affirmed Defendant's three solicitation to commit murder convictions.

## I.    Defendant's initial detention by Sgt. Postiglione

Defendant contends that the trial court should have suppressed the evidence seized from the search of Defendant's (1) semi truck, (2) tractor trailer, and (3) person because "all such evidence was obtained as the result of his illegal detention." Defendant argues that Sgt. Postiglione's initial interaction with Defendant constituted a seizure not supported by reasonable suspicion. Defendant asserts that the initial encounter was not consensual because Defendant closed the curtain after the first knock by Sgt. Postiglione and only exited the truck after Sgt. Postiglione's display of authority. The State responds that the circumstances that proceeded Sgt. Postiglione's encounter with Defendant provided reasonable suspicion, or alternatively, the State asserts that the initial encounter was a consensual police-citizen encounter for which no reasonable suspicion is required. The State

further asserts that the consensual police-citizen encounter was not transformed into a seizure when Sgt. Postiglione retained Defendant's driver's license.

In *State v. Bruce D. Mendenhall*, No. M2010-01381-CCA-R3-CD, ___ WL ___ (Tenn. Crim. App. at Nashville, filed Jan. 30, 2013, a panel of this court held that Defendant's initial interaction with Sgt. Postiglione was a consensual police-citizen encounter, and therefore, no reasonable suspicion was required for Sgt. Postiglione to approach Defendant's truck and ask to speak with him. This court held that Defendant was effectively seized when Sgt. Postiglione took possession of Defendant's driver's license. However, the totality of the circumstances, including Sgt. Postiglione's observations, justified his seizure of Defendant. We agree with and adopt the conclusions made by this court in that opinion. Defendant is not entitled to relief on this issue.

Defendant also asserts that evidence obtained from his person, including DNA swabs taken after his arrest, his finger and palm prints, "and any other evidence derived from those items or his person," including prints and DNA found on items inside Defendant's truck, should have been suppressed. We have already concluded that Defendant's detention at the truck stop was not illegal; therefore, Defendant's argument that his consent to give a DNA sample was "involuntary and unattenuated from the taint of his illegal detention" is without merit. Alternatively, Defendant asserts that a DNA sample was obtained from Defendant pursuant to an invalid search warrant. For the reasons stated below, Defendant is not entitled to relief on this issue.

## II.    Search warrant

Defendant asserts that the search warrant for the tractor trailer was obtained based on an affidavit that contained materially false statements, and therefore the evidence seized from the tractor trailer should have been suppressed on that basis. We conclude that the trial court properly denied Defendant's motion to suppress.

The Fourth Amendment to the United States Constitution requires that search warrants issue only "upon probable cause, supported by Oath or affirmation." Article I, Section 7 of the Tennessee Constitution precludes the issuance of warrants except upon "evidence of the fact committed." Therefore, under both the federal and state constitutions, no warrant is to be issued except upon probable cause. *Illinois v. Gates*, 462 U.S. 213. 235-37, 103 S. Ct. 2317 (1983); *State v. Jacumin*, 778 S.W.2d 430, 431-32 (Tenn. 1989). Probable cause has been defined as a reasonable ground for suspicion, supported by circumstances indicative of an illegal act. *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998).

In *Franks v. Delaware*, the United States Supreme Court held that the fruits of a search should be excluded when the affidavit in support of the search warrant contains deliberately or recklessly false statements by the affiant, which are material to the establishment of probable cause. 438 U.S. 154, 172-73, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). The "fraudulent misrepresentation of a material fact will invalidate a search warrant." *State v. Little*, 560 S.W.2d 403, 406 (Tenn. 1978). Our supreme court has defined two situations in which false information within the supporting affidavit mandates the application of the exclusionary rule despite the affidavit's facial sufficiency:

> (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause, and
>
> (2) a false statement, essential to the establishment of probable cause, recklessly made. Recklessness may be established by showing that a statement was false when made and that affiant did not have reasonable grounds for believing it, at that time.

*Id*. at 407. Allegations of negligence or innocent mistakes are insufficient to invalidate the search warrant. *State v. Yeomans*, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999). In order to be entitled to relief, a defendant must show that the reckless statements were necessary to the finding of probable cause." *Id*. The defendant has the burden to establish the allegation of perjury or reckless disregard by a preponderance of the evidence. *Id*. (citing *Franks v. Deleware*, 438 U.S. at 156).

The relevant portion of the affidavit in support of the search warrant, which was obtained on the date of Defendant's arrest, states as follows:

> On 6/26/07 Sara Hulbert was found deceased in the corner of the parking lot at 111 N. First Street. She [suffered] a gunshot wound to the head . . . . Evidence at the scene where her body was found included tire tracks and shoe prints in mud a short distance from her body. An eyewitness stated that he observed a truck pull into the area where her body was found and left 15 to 20 minutes later around 12:00 a.m. on the 26[th] of June. Surveillance video from businesses in the area showed one semi truck entering and leaving the truck stop during this time frame. The vehicle was a yellow truck pulling a white trailer. A truck appearing to be one and the same as seen in the video was observed driving around 111 N. First on 7/12/07. The vehicle pulled into the parking lot of the truck stop and parked. The truck was approached after it parked and the driver spoke with myself and Sergeant Postiglione.

Defendant contends that Detective Freeman's omissions that Mr. Uhlir reported seeing a white Volvo truck between 11:30 p.m. and 12:00 a.m. made his statement "deceptively false." Defendant argues that the affidavit implies that the eyewitness, Mr. Uhlir, observed a yellow truck enter and leave the TA and that the video surveillance documented the same truck entering and leaving around midnight when, in fact, video showed a yellow truck entering and leaving between 12:10 and 12:30 a.m. The trial court denied Defendant's motion to suppress the evidence found in Defendant's truck. The trial court found that Detective Freeman did not make any false or reckless statements in the affidavit. We agree. At the hearing on Defendant's motion to suppress, Detective Freeman testified that he knew that Mr. Uhlir had initially stated that he saw a truck park beside his truck at the truck stop "around midnight." Mr. Uhlir had stated "that it was a light-colored truck and that it was pulling a white trailer with no distinctive markings on it." Detective Freeman testified that Mr. Uhlir stated that "he just wasn't sure" about the time that the other truck arrived at the truck stop, and Mr. Uhlir informed detectives that his company kept GPS tracking records. The GPS tracking showed that Mr. Uhlir's truck engine turned off at 12:10 a.m. In the course of his investigation, Detective Freeman viewed surveillance video of the truck stop and saw a yellow tractor "pulling a white trailer with no distinct markings on the trailer" entering and leaving the truck stop between 12:10 and 12:30 a.m.

The trial court found that the truck viewed in the video surveillance generally fit the description given by the witness, Mr. Uhlir, "especially when viewed at night." The trial court found that the statement in the affidavit that a truck "appearing to be one and the same" drove into the truck stop during the relevant time frame is not a materially false statement, but rather "[i]t only means that a similar tractor trailer rig with an ordinary (non-container) trailer was located [during] the same time period and [at the] same business location and specifically at the location the victim's body was found as the vehicle driven by a murder suspect." Our supreme court has held that a detective's statement in an affidavit can be a reasonable conclusion based upon information obtained during the investigation." *State v. Dellinger*, 79 S.W.3d 458, 470 (Tenn. 2002). The evidence does not preponderate against the trial court's findings. Defendant is not entitled to relief on this issue.

## III. Defendant's statements to police

Defendant contends that the trial court should have suppressed all of Defendant's statements to police "because they were the fruit of his illegal seizure and interrogation." We have already concluded that Defendant was not illegally detained at the truck stop; therefore, the statements that he made to Sgt. Postiglione during that encounter were not subject to suppression for that reason.

Defendant also argues that his statements should have been suppressed because they were made during a custodial interrogation. This issue was also decided by this court in *State v. Bruce D. Mendenhall*, No. M2010-01381-CCA-R3-CD, supra. In that case, we held that Defendant was not in custody for *Miranda* purposes when Sgt. Postiglione searched his truck. This court further held that Defendant's statements to Sgt. Postiglione in Sgt. Postiglione's car following Defendant's arrest were voluntary and not the result of interrogation. Finally, this court held that Defendant's statements after detectives warned him of his *Miranda* rights were not "tainted" because there was no violation of the *Miranda* requirements prior to Defendant's formal interview with detectives. We agree and adopt the conclusions made by this court in that opinion. Defendant is not entitled to relief on this issue.

## IV. Defendant's statements to fellow inmate

Defendant asserts that the trial court erred by allowing into evidence statements he made to fellow inmate Roy McLaughlin "because they were obtained in violation of his right to counsel and his protection against self-incrimination." Defendant argues that his constitutional right against self-incrimination was violated because he was not informed that McLaughlin was acting as an agent of the State and that he was not given *Miranda* warnings before speaking to McLaughlin. This same issue was decided by this court in Defendant's solicitation case in *State v. Bruce D. Mendenhall*, supra. Relying on *Illinois v. Perkins*, 496 U.S. 292, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990), this court concluded that *Miranda* warnings were not required prior to McLaughlin's conversations with Defendant. In *Perkins*, the United States Supreme Court held that *Miranda* warnings were not needed when an undercover law-enforcement officer posing as a fellow inmate questioned a defendant about an offense unrelated to the offense for which the defendant was incarcerated. Our supreme court has acknowledged the holding in *Perkins*, and also found that an inmate's trust may be "misplaced" in trusting someone who is acting as a police agent, but that does not equate to a violation of *Miranda*. *State v. Branam*, 855 S.W.2d 563 (Tenn. 1993).

This court also held that Defendant's Sixth Amendment right to counsel was not violated because the right to counsel "'is offense specific'" and "'cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced.'" *State v. Bruce D. Mendenhall*, supra (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991)). We agree with and adopt this court's conclusions in Defendant's solicitation case. In that case, Defendant urged this court to extend his invocation of his right to counsel in this case to his solicitation case because the cases were factually "intertwined." Although Defendant had previously invoked his right to counsel in this case, the trial court properly ruled that the recorded portions of McLaughlin's conversations with Defendant that referenced Ms. Hulbert's murder were inadmissible

because they violated Defendant's right to counsel. The portions of the recording that were admitted at trial referenced Defendant's solicitation of McLaughlin to murder potential witnesses in this case.

In a similar case, this court found that there was no Sixth Amendment violation when an informant gathered information on murder solicitation allegations from a defendant who had invoked his right to counsel on a pending murder charge. *State v. March*, ___ S.W.3d ___, 2011 WL 332327 (Tenn. Crim. App. 2011). This court concluded that "the admission of [the defendant's] statements to [the informant] concerning the as yet uncharged conspiracy to kill [the defendant's in-laws] in his trial for the murder of Janet March did not violate [the defendant's] Sixth Amendment right to counsel." *Id*. As was the case in *March*, Defendant's right to counsel was not violated because he had not invoked his right to counsel with respect to the later-filed charges of solicitation to commit murder. Defendant is not entitled to relief on this issue.

## V.     Evidence of prior crimes

Defendant asserts that the trial court erred by allowing the State to introduce evidence that Defendant was convicted for solicitation to murder Lori Young, David Powell, and Richie Keim. At a pretrial hearing on Defendant's motion to exclude evidence of his solicitation convictions, the State informed the court that it did not "intend to put on that he was convicted" of the solicitation charges. In a written order denying Defendant's motion, the trial court found that Defendant's solicitation convictions were relevant to show his identity as the perpetrator in this case. The trial court found as follows:

> [I]t is clear the State will attempt to prove to a jury that the defendant, and not any other individual, killed Sara Hulbert. Identity of the perpetrator is a central issue in this case. In various other statements, the defendant has indicated his animosity for the three individuals he alleges committed the homicide and his need to prevent Young, K[ei]m, and Powell from being able to testify.
>
> . . . .
>
> The identity of the perpetrator of the homicide is an issue for the jury in the instant case. Therefore, the evidence of solicitation is relevant in the homicide case per the *Tillery* [*v. State*, 565 S.W.2d 509 (Tenn. Crim. App. 1978)] line of cases. Further, as applied to this case, the defendant's attempt to eliminate these three individuals as witnesses is probative as both

inconsistent with [Defendant's] claim of innocence and evincing a consciousness of guilt.

The trial court further found that the probative value of evidence of Defendant's solicitation convictions outweighed the danger of unfair prejudice. The court found:

Without question, the evidence of defendant's participation in a scheme to have these three witnesses killed is prejudicial. In fact, the evidence at the trial resulted in convictions on the solicitations. However, this same evidence is highly probative for the reasons set out in the discussion above. The defendant is now on trial for killing Sara Hulbert. Evidence that the defendant devised a plan to kill three individuals whom he alleges committed the homicide is highly probative on the issue of identity. . . . This is not a case where the other crime, wrong or act is so removed from the instant offense that its admission would unfairly prejudice the defendant. Instead, the solicitation related directly to [the] killing of three individuals at issue in the homicide trial.

The admissibility, relevancy, and competency of evidence are matters entrusted to the sound discretion of the trial court, and this court must review the trial court's evidentiary rulings for an abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). Rule 401 of the Tennessee Rules of Evidence states that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 states that "[a]ll relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules of law generally applicable in the courts of Tennessee. Evidence which is not relevant is not admissible." Tenn. R. Evid. 401, 402.

On appeal, Defendant argues that the trial court erred when it allowed recorded conversations between Defendant and fellow inmate Roy McLaughlin to be introduced into evidence. Defendant argues that the evidence should have been excluded under Rule 404(b) of the Tennessee Rules of Evidence. Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court must upon request hold a hearing outside the jury's presence.

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

If a trial court has substantially complied with the procedural requirements of the rule, this court will review the trial court's ruling for an abuse of discretion. *DuBose*, 953 S.W.2d at 652. We conclude that the trial court in this case substantially complied with the procedural requirements of Rule 404(b). As noted above, the trial court (1) held a pretrial hearing on Defendant's motion to exclude the evidence; (2) found that evidence of Defendant's solicitation convictions was relevant to prove Defendant's identity as the perpetrator of Sara Hulbert's murder, a material issue in this case, and the trial court stated its findings in a written order; (3) found that Defendant was convicted by a jury of the solicitation charges, and therefore, "the existence of these crimes [was proved] not only by clear and convincing evidence but also beyond a reasonable doubt[;]" and (4) found that the probative value of the evidence was not outweighed by the danger of unfair prejudice.

"Generally, evidence of threats against witnesses attributed to the accused is probative as being either (1) conduct inconsistent with the accused's claim of innocence or (2) conduct consistent with the theory that the making of such threats evinces a consciousness of guilt." *State v. Austin*, 87 S.W.3d 447, 477 (Tenn. 2002) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 4.01 (4th ed. 2000); *see also State v. Damien Neely*, W2010-01128-CCA-R3-CD, 2011 WL 3768918, at *14 (Tenn. Crim. App., Aug. 24, 2011).

The trial court also instructed the jury at trial that it could not consider the evidence "to prove [Defendant's] disposition to commit such a crime as that of which he is on trial." The court instructed the jury that it could only consider the evidence "for the limited purpose of determining whether it provides the defendant's identity; that is, such evidence may be considered by you if it tends to establish the defendant's identity in the case for which he's on trial or guilty knowledge."

-23-

We agree with the trial court's findings and conclude that the trial court did not abuse its discretion. Defendant is not entitled to relief on this issue.

## VI.   Defendant's motion to exclude jailhouse phone calls

Defendant asserts that the trial court erred by admitting redacted portions of recorded telephone conversations Defendant had while incarcerated. The trial court denied Defendant's pretrial motion to exclude the recorded phone calls. In its written order, the trial court noted that "[t]hese phone calls were previously ruled upon by the Court as to their admission in the Defendant's trial in case 2008-C-2541 [the solicitation case]." Defendant also challenged the trial court's ruling regarding the phone calls, as well as letters written by Defendant from jail, in *State v. Bruce D. Mendenhall*, supra, in which a panel of this court held that the trial court did not abuse its discretion by admitting the redacted phone calls and several letters sent by Defendant from jail (with the exception of certain letters written by Defendant that are not at issue in the present case, which this court held were improperly admitted but amounted to harmless error). Because the offenses and the material issues in the two cases differ, we will address the issue separately in this opinion.

In this case, the trial court admitted into evidence portions of eight phone calls placed by Defendant from jail. The substance of the phone calls is summarized as follows:

Call #1 on 8/27/07 – In this call, Defendant stated, "trying to find alibis for when they're saying this shit happened. That's what's hard. Finding them. Remembering dates, times." Defendant said, "[a]bout the only way to get one is to lie about one."

Defendant asserts that Defendant's use of the plural terms "dates" and "times" indicates that there was more than one victim. We disagree. Defendant also asserts that he "was merely explaining how hard it was for him to remember particular events, and he never suggested in the call that anyone should lie on his behalf to provide an alibi." While Defendant did not explicitly state that someone should lie on his behalf, he indicated that his only option would be "to lie about" an alibi. We agree with the State that the conversation was relevant to show Defendant's guilty knowledge because Defendant believed that he needed to lie in order to create an alibi.

Calls #2 and #3 on 10/8/07 – Defendant told his wife that he would "rather just go home and be with you guys," and said, "if I don't get some alibis here, I won't be." In call #3, Defendant stated, "['c]ause Ms. Mary has got them playing me for a psycho. So, unless I can get an alibi, you know I was somewhere else, I'm done."

Defendant asserts that "Ms. Mary" was never identified and "the minimal context made it unclear why her actions would cause him to believe he needed alibis." However, we agree with the State's assertion that the reference to "Ms. Mary" was insignificant and the content of the phone calls was focused on Defendant's need to find alibis.

Call #4 on 10/12/07 – Defendant told his wife that he had asked his son Ryan Mendenhall if he would provide an alibi for him, and Ryan Mendenhall declined to provide an alibi for Defendant. Defendant stated, "if I needed an alibi would he, you know, be it, and he said, 'No.'" Defendant also stated, "Yeah, and I, well, like I told you in that one letter, if I don't bring some alibis, I'm done. The only way to beat this system down here is with alibis. And sometimes that don't do you no good."

Call #5 and #6 on 10/15/07 – Defendant stated, "But, that's what I told Ryan, you know, 'Hey, I need your support buddy.'" Taken in context of all of the phone calls, Defendant's statement references his request to his son to provide him an alibi.

Defendant asserts that in call #6, Defendant's reference to three unidentified individuals, "L-C-V," "Dan," and "her hubby" "could very easily lead to jury confusion or speculation. We note that the record indicates that there was not a second phone call on October 15, 2007, and the above references were actually part of the same conversation in which Defendant made the statement about his son Ryan. The State concedes that the references were not relevant to a material issue in this case, but asserts that the error was harmless and points out that Defendant's references to these people were brief and there was "no likelihood that it led to jury confusion." We agree with the State. There is nothing to indicate that the references prejudiced Defendant in any way.

Calls #7 and #8 on 10/22/07 – Defendant stated his belief that two and a half minutes of his "interview tape" was missing, and as a result, he would have to prove that he asked for an attorney and denied detectives his permission to search his truck. The State concedes that the phone call contains no relevant evidence; however, the State asserts the error was harmless. Defendant asserts that the evidence "was likely to confuse the jury, cause them to speculate about irrelevant facts, and potentially reflect poorly upon [Defendant]'s character." We agree with the State that any error was harmless.

In call #8, Defendant stated, "[i]n other words, if I can get, you know like, Aries or somebody like that to say, 'Well I was walking down the railroad tracks when they [were] trying to arrest this guy and, we snuck down into some higher grass, and listened and we heard the driver say, "No you can't search my truck, and I want [a] lawyer." You know, something like that.' Defendant asserts that the second portion of this phone call misled the jury and implied that Defendant was charged with other offenses. Defendant told his wife,

"they've just stacked a lot of shit on me," and his wife replied, "[t]hey're trying to get you for every freaking thing." Defendant then stated, "[s]o, I gotta, you know, come up with some alibis . . . ." The State asserts that because neither Defendant nor his wife specifically state that he was charged with other offenses, the statements were not likely to create jury confusion. In the context of Defendant's statements that he needed alibi witnesses in this case, the statements that detectives had "stacked a lot of shit" on Defendant and were "piling stuff" on him does not necessarily imply that Defendant was referencing other charges. Defendant's statements could be interpreted to mean that detectives had gathered a substantial amount of evidence against Defendant. Nevertheless, we conclude that any error was harmless.

Call #9 was made by Defendant from prison after he was convicted of solicitation to commit murder. The relevant portion of the phone call is as follows:

[Defendant]: And I, I was sent here Tuesday.

Female: Yeah.

[Defendant]: I was put in population . . . Thursday I was put back into uh isolation.

Female: Why?

[Defendant]: Somebody threatened to put a shank in my back.

Female: Why?

[Defendant]: Because I killed their friend's girl.

Female: Oh.

Defendant argues that because the "friend's girl" was not identified, the jury might have believed Defendant was referring to another woman who Defendant was charged with murdering. As the trial court noted, however, the "jury won't know that there's any other victims out there that [Defendant] has anything to do with, so why would they be assuming that it has to do with somebody else?" The State argues that Defendant's statement in this phone call was relevant and admissible as a statement against interest that Defendant had killed a woman. Defendant argues that his statement that he "killed their friend's girl" was not an "assertion" and therefore not admissible under the hearsay exception in Tenn. R. Evid. 802(1.2). Hearsay is defined as "a statement, other than one made by the declarant while

-26-

testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A "statement" is defined as "an oral or written assertion." Tenn. R. Evid. 801(a). The Rules of Evidence do not define "assertion." Defendant argues that "it was clear that [Defendant] was not asserting that he in fact killed the unidentified inmate's 'friend's girl.' Instead, he was repeating to [the female] in a sarcastic and mocking tone of voice the reported reason that another inmate threatened to harm him." Defendant cites *State v. Land*, 34 S.W.3d 516, 525 (Tenn. Crim. App. 2000), in which this court held that "[a]n utterance must, in order to be an assertion, be offered with the intent to state that some factual proposition is true." We note that if Defendant's statement was not an "assertion" as contained in the definition of hearsay, then it would not be inadmissible under Tennessee Rule of Evidence 802. However, Defendant also asserts that "as non-hearsay, the evidence was also inadmissible because it was not relevant, trustworthy or probative of any [issue] in dispute."

We conclude that the jury could determine whether Defendant's statement was sarcastic or an assertion. If intended as an assertion, it is a statement against interest. If intended as a sarcasm, we believe that the statement was not relevant to any fact at issue; however, the admission of Defendant's sarcastic answer to the question of why another inmate threatened to harm him was harmless in light of the other evidence at trial. Defendant is not entitled to relief on this issue.

## VII. Defendant's motion to call a ballistics expert to testify

Defendant asserts that the trial court erred by denying his motion to call a ballistics expert to testify at trial, or alternatively, by denying his motion to continue the trial date. On May 7, 2010, the Friday before the Monday on which Defendant's trial began, Defendant filed a "Motion for Permission to Call Expert Witness" and a notice of intent to call as a witness ballistics expert David Brundage. Defendant attached to his motion a copy of Mr. Brundage's report and curriculum vitae and a list of materials Mr. Brundage reviewed. The State filed a motion to exclude Mr. Brundage's testimony on the basis that Defendant failed to provide timely notice of the witness. On appeal, the State contends that the evidence was not critical to Defendant's defense and that the trial court did not err by denying Defendant's late request to allow Mr. Brundage to testify.

The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment "'clearly guarantees a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense.'" *State v. Wyrick*, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001) (quoting *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000)). Although this right is critical, at times it "'must yield to other legitimate interests in the criminal trial process,'" including "'established rules of procedure and evidence designed to

assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Brown*, 29 S.W.3d at 432 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295, 302, 93 S. Ct. 1038, 1046, 1049, 35 L. Ed. 2d 297 (1973)). An evidentiary ruling ordinarily does not rise to the level of a constitutional violation. *State v. Rogers*, 188 S.W.3d 593, 614 (Tenn. 2006) (citing *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003)). In determining whether the constitutional right to present a defense has been violated by the exclusion of evidence, a court should consider whether: (1) the excluded evidence is critical to the defense; (2) the excluded evidence bears sufficient indicia of reliability; and (3) the interest supporting the exclusion is substantially important. *Id*. On appeal, we will not disturb a trial court's decision to admit or exclude expert testimony absent an abuse of discretion. *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006).

In his report, Mr. Brundage concluded that the results of his testing of Defendant's rifle and the bullet that killed the victim were inconclusive. He noted that "there were not sufficient striae to make a positive identification or elimination" of the rifle as having fired the bullet. The State argues that the evidence was not critical to the defense because Mr. Brundage's findings were inconclusive. Defendant argues that Mr. Brundage's testimony would have contradicted the State's expert's conclusion that the bullet was fired from Defendant's rifle. The trial court alluded in its ruling that Defendant's own statement that the victim was killed using his rifle confirms the State's ballistic expert's conclusion. The following exchange was had on the day Defendant's trial began, before the jury was selected:

| [Assistant Public Defender]: | What [Mr. Brundage] does say is that the State's evidence that the bullet was fired from this weapon is, in fact, not the case according to him and that there are not enough matches on the bullet for anybody to be able to make that statement. I think this is critical to our case, it shows that possibly another weapon fired the bullet which killed Ms. Hulbert and – |
| --- | --- |
| THE COURT: | And Mr. Mendenhall's mistaken? |
| [Assistant Public Defender]: | Well, Your Honor, I believe my memory is that he says it could have. |
| THE COURT: | Well, he says – and the question: ["]And you suspect that the girl that |

was killed at the truck stop[ ] here in Nashville was shot to death with your rifle[?"] [and Defendant says], ["]yeah.["]

[Assistant Public Defender]:    Well, I believe he did suspect that, Your Honor, but it may not be true.

THE COURT:    So you're theory would then be your client's wrong?

[Assistant Public Defender]:    Possibly, Your Honor, yes.

The trial court also noted that it had been "two and a half years since this case was officially originated by way of indictment . . . ." and that the parties had agreed to and the court had imposed a deadline for filing notices of expert witnesses. We conclude that the trial court did not abuse its discretion in excluding the testimony of Defendant's ballistics expert. We agree with the trial court's conclusion that the evidence was not critical to Defendant's defense. As the State asserted in its argument to the trial court, uncontroverted evidence was admitted at trial that the victim's DNA and blood were found on Defendant's rifle. We recognize that that evidence alone does not necessarily establish that Defendant's rifle was used to kill the victim. As the trial court noted, the rifle could have "just [been] in the cab and was exposed to the blood but it wasn't used." However, evidence that the victim's blood was found on the rifle, that Defendant told detectives that he believed his rifle was used to kill the victim, and the State's expert's testimony that the bullet that killed the victim was fired from Defendant's rifle, taken together, would not be sufficiently contradicted by another expert's testimony that the results of his testing were "inconclusive." We also conclude that the trial court did not abuse its discretion in denying Defendant's request for a continuance. For the reasons stated above, Defendant has not made a clear showing of prejudice as a result of the trial court's denial of a continuance. *See State v. Robinson*, 146 S.W.3d 469, 517-18 (Tenn. 2004). Defendant is not entitled to relief on this issue.

## VIII.  Relevance of evidence seized from Defendant's truck

Defendant asserts that the trial court erred by admitting as relevant several items found in Defendant's truck. Defendant argues that the trial court should have excluded "blood evidence" as improper evidence of other crimes, wrongs, or acts under Tennessee Rule of Evidence 404(b). Defendant also argues that the trial court should have excluded from evidence a handwritten note, sex toys, and a nightstick because those items "lacked any

probative value or relevance to the material issues in dispute" and that "even if these items were somehow relevant, any relevance was outweighed by the danger of unfair prejudice." The State responds that evidence of blood found inside Defendant's truck was evidence of the murder of Ms. Hulbert and not evidence of the murder of any other victim. The State also asserts that the trial court properly admitted the handwritten note, sex toys, and nightstick because those items were relevant to show that Defendant was the perpetrator of the crime.

As stated above, "[r]elevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 403 of the Tennessee Rules of Evidence states that even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. On appeal, this court will review the trial court's decision to admit or exclude evidence as relevant or not relevant under an abuse of discretion standard. *See DuBose*, 953 S.W.2d at 652.

As we noted earlier, evidence of other crimes, wrongs, or acts may be admissible for purposes other than "to prove the character of a person in order to show action in conformity with the character trait" if the conditions of Rule 404(b) are satisfied. However, we do not believe that the evidence that Defendant complains about is evidence of another crime, wrong, or act. Defendant complains of Sgt. Postiglione's testimony that he observed what appeared to be blood on Defendant's person, on shoes found inside Defendant's truck, and on items in a trash bag found behind the driver's seat of Defendant's truck. Regarding the bloody clothes found in a bag inside Defendant's truck, the trial court allowed the State to ask "limited questions" about the bag, but ruled that Sgt. Postiglione could not testify about specific items of clothing because the clothing indicated other victims. Defendant also complains of the knife found inside Defendant's truck that was admitted into evidence. With respect to the knife, the trial court found that it was relevant because a knife could "be used to cause [the] injuries found on Ms. Hulbert." Agent Ihrie testified at trial that the DNA on the knife generated only a "small amount of a profile that indicated the presence of female DNA;" however, there was no evidence that the blood came from a victim other than the victim in this case. Defendant asserts that the evidence was relevant only to the reason Sgt. Postiglione placed Defendant under arrest. We disagree. There was no evidence presented to the jury that blood found on any item in Defendant's truck came from any other victim and moreover, evidence that a knife that could have caused the victim's injuries and bloody clothes are relevant because that evidence makes it more probable that Defendant killed the victim.

Defendant also asserts that the trial court erred by allowing the State to introduce into evidence a handwritten note that stated "go back to TA 4 sex" two sex toys and a nightstick. Defendant sought to exclude those items "because there was no evidence linking them to Ms. Hulbert's murder, and thus, they lacked any probative value or relevance to the material issues in dispute." Defendant asserts that the danger of unfair prejudice outweighs any probative value.

The trial court found that the handwritten note was relevant because the autopsy report showed injuries to the victim's genital and anal areas that could be related to acts of intercourse. The note referenced the possibility of a sexual encounter at the truck stop where the victim's body was found, and the victim had injuries indicating sexual trauma. Regarding the sex toys and the nightstick, the medical proof indicated that the victim had injuries consistent with the "instrumentalities" found in Defendant's truck. We conclude that the trial court did not abuse its discretion by admitting those items into evidence. Defendant is not entitled to relief on this issue.

## IX.    Victim photographs

Defendant contends that the trial court abused its discretion by admitting into evidence crime scene photographs and autopsy photographs of the murder victim. The Defendant argues that 24 photographs of the crime scene and autopsy, some of which graphically depicted the victim's nude body and gunshot wound, "were not relevant to any contested issue at trial" because Defendant did not contest the manner in which the victim was killed or injured, and therefore, the photographs were used only to inflame the jury. Defendant further asserts that even if relevant, the photographs should have been excluded under Tennessee Rule of Evidence 403 because their probative value was substantially outweighed by the danger of unfair prejudice.

The determination of the admissibility of photographs lies within the sound discretion of the trial court. *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992); *State v. Evans*, 838 S.W.2d 185, 193 (Tenn. 1992); *see* Neil P. Cohen, et al., Tennessee Law of Evidence, § 4.01[17][a], at 4-36 (4th ed. 2000). The decision of the trial court to admit a photograph into evidence "will not be overturned on appeal absent a clear showing of an abuse of discretion." *State v. Vann*, 976 S.W.2d 93, 103 (Tenn. 1998); *see State v. Cazes*, 875 S.W.2d 253, 262-63 (Tenn. 1994). To be admissible, a photograph must be relevant to some issue at trial and the danger of unfair prejudice, confusion of the issues, or misleading the jury must not substantially outweigh its probative value. Tenn. R. Evid. 403; *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978); *see* Cohen, supra, § 4.01[17][d], at 4-38. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis,

commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951. This Court has explained that:

> Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of "bias, sympathy, hatred, contempt, retribution, or horror." Murder is an absolutely reprehensible crime. Yet our criminal justice system is designed to establish a forum for unimpaired reason, not emotional reaction. Evidence which only appeals to sympathies, conveys a sense of horror, or engenders an instinct to punish should be excluded.

*State v. Collins*, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (citations omitted). In deciding whether to admit photographs, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt, as well as other evidence that has been introduced during the course of the trial. *State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). Before any photograph can be admitted into evidence it must be verified and authenticated by a witness with knowledge of the facts. *Banks*, 564 S.W.2d at 949-50; *see* Cohen, supra, § 4.01[17][e], at 4-38.

During a jury-out hearing, the State advanced reasons for each of the four photographs of the victim's body at the crime scene. With respect to the first photograph that was admitted, the State explained that it showed a blood trail leading to the victim's body in the back of the truck stop. The State also explained that the photograph showed the manner in which the victim's body was positioned with the soles of her feet together, her knees apart, and her vagina being the first thing a person who found her body would see. The State wanted to show that a person "who just innocently finds a body in their vehicle is not likely to position them in such a horrific manner and to place them to be seen in that manner." The State sought to introduce another photograph showing that the victim's feet had been placed together and her legs "spread open." The State explained, "[t]his was a placement that took time, that took conscious thought and deliberation, which is what this is about." The trial court did not allow the duplicative photograph into evidence.

The trial court allowed the State to introduce into evidence a photograph of the victim's head because it showed the entrance wound of the bullet that was "facing upwards." The photograph also showed the plastic wrap under her head. Another photograph that was admitted was a distant shot of the crime scene that included the chain link fence that ran behind the truck stop. The victim's body is barely visible in the photograph. The State wanted to use that photograph to show the scene and location of the victim's body. The trial court ruled that the photographs were relevant because "the jury is trying to determine what [Defendant's] state of mind was, if in fact he's the murderer, what happens afterwards with

the body." The court noted that the photograph showing the crime scene was "not at all even arguably graphic."

The State also sought to introduce a photograph that showed that the victim's wrist was displayed with an identification bracelet positioned upward and a photograph of blood transfer on the victim's groin, leg, and knee. A photograph of the blood on the victim's face was "consistent with her head being placed in a bag, which was what was stated by the defendant in his statement." Another photograph showed blood "drippage" that occurred after the body had been placed. A photograph showing that the victim's tattoo had been cut out was admitted. The State wanted to show that, contrary to Defendant's statement that he did not know a tattoo had been cut out, it was obvious given the "large nature of the wound that would be noticeable to anyone carrying Ms. Hulbert's body." The trial court concluded that those photographs would be admissible because they showed "different parts of the body, do show blood transfer, do show blood droplets, do show items that could be probative of these issues to be decided."

The trial court also concluded that nine autopsy photographs of the victim were admissible because the photographs of the victim's body at the crime scene did not "show the details of the injuries that these are attempting to show." The trial court found that the autopsy photographs were "not unduly gruesome. There's no blood shown on them." In a jury-out hearing, Dr. Li testified that he took the photographs during the victim's autopsy. The first photograph showed the victim's torso with bruising on her chest, under her left eye, neck, and on her forehead. Closer photographs of the victim's face showed bruising under her left eye and a "pattern to linear contusion on the right side of the forehead and some contusions on the nose." Dr. Li also photographed and took measurements of a nightstick and concluded that the nightstick was consistent with causing the pattern contusions on the victim's face. Other photographs of the victim's face showed "more close-up contusions around the eye, nose, [and] forehead[,]" a "raised up area" on the victim's forehead, an abrasion on the victim's lip, and bruising and abrasions on her jaw. A close up photograph showed a contusion on the victim's vaginal area. Another photograph showed the wound on the victim's buttock. Dr. Li testified that there was a linear incision and a "ripped irregular-shaped borderline of the defect of the skin." The wound was consistent with a cutting by a knife, razor, or sharp box cutter. Another photograph showed a tear in the victim's anus. Dr. Li testified that the bruising around the injury indicated that it occurred at the time of the victim's death or after her death.

The trial court noted the relevance of the photographs as follows:

> I mean, obviously the State has to prove the elements of the offense. And
> I understand the defendant's position that they are not disputing that, Ms.

– I guess not disputing there's a first degree murder. But the State, as the parties know, [doesn't] have to stipulate various elements unless they are unfairly prejudicial. Several of these photos, according to the State, and just viewing them, have been cropped so that a fully body picture would not be necessary to describe the injuries about Ms. Hulbert's head area. That has occurred.

What's the value of them in terms of evidence? Well – and that's one of the reasons I asked Dr. Li about the timing, which he – according to him, these injuries would have been perpetrated at or near the time of death. I mean, what occurred to her at or near the time of death would explain who did it, how she was treated, what may have lead [sic] to her being shot.

The gunshot picture, as the doctor indicated, shows the stippling or the – and some sort of injury there to the wound itself. So all of those in terms of explaining to the jury what is an anal laceration, what does a vaginal contusion look like; they don't know. I mean, the best way to show them is with a picture that is not unduly gruesome or unfairly prejudicial.

So if these injuries occurred at or near the time of her death, and coupling that with the items and other evidence that – including [Defendant's] statement, the positioning of the body, items found in his particular cab, all of that goes to prove, if the jury credits it, who did it, who perpetrated these injuries upon Ms. Hulbert.

Because circumstantially; you all have talked about this, that might indicate who did it, whoever inflicted these injuries at or near the time of the death. So I don't – as I've already indicated, don't find that they're unduly gruesome or otherwise inadmissible under 403.

We conclude that the trial court did not abuse its discretion by admitting the photographs into evidence. We agree with the trial court's finding that the autopsy photographs are not unduly gruesome and were relevant to show the victim's injuries. For the reasons advanced by the State and accepted by the trial court, we also conclude that the four crime scene photographs of the victim's body were relevant to material issues at trial to be considered by the jury in determining Defendant's guilt. Defendant is not entitled to relief on this issue.

## X.	Sufficiency of the evidence

Defendant contends that the evidence presented at trial is insufficient to support his conviction. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Smith*, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 199 Tenn. 298, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *Liakas*, 286 S.W.2d at 859. This court must afford the State the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *Id*.

Premeditated first degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question of fact to be determined by the jury. *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Premeditation "may be established by proof of the circumstances surrounding the killing." *Suttles*, 30 S.W.3d at 261. The Tennessee Supreme Court noted that there are several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *Id*.; *see Bland*, 958 S.W.2d at 660.

Viewed in a light most favorable to the State, the evidence established that Defendant killed the victim. Defendant was at the truck stop on the night the victim was murdered. Defendant's former employer testified that he told Defendant to stay away from "lot lizards," or prostitutes, and Defendant replied, "I just shoot them." In his statements to detectives, Defendant averred that Terry Sanders, David Powell, Richard Keim killed the victim, and Defendant disposed of her body. There was no evidence presented at trial to support that claim. The victim was shot using Defendant's rifle. The victim's blood was found inside Defendant's truck and on Defendant's rifle. A nightstick was found in Defendant's truck, which Dr. Li testified could have caused the additional injuries to the victim. Muddy shoe prints were found at the crime scene near the victim's body. Agent Littlejohn testified that shoes found inside Defendant's truck could have made the impression. The victim's body was positioned in a deliberate manner.

The State contends that the evidence supports a finding of premeditation. Defendant "mutilated Ms. Hulbert's body and then posed her body in a way that took time and indicated a calmness of being" that indicates premeditated murder. The evidence at trial showed that the victim's tattoo was cut out of her buttock using a knife or razor at the time of her death or after her death. The victim also suffered an anal injury caused by a blunt object at the time of her death or after her death. Photographs of the victim's naked body showed that the body was positioned so that her vagina was prominently displayed, and an identification bracelet was carefully positioned facing upward on Defendant's wrist. Defendant told detectives that he found the victim dead in his truck, and he "dropped her down on the ground and left." Defendant's statement is not consistent with the evidence presented at trial. Defendant told detectives that David Powell and Richie Keim killed the victim in Defendant's truck while Defendant was inside the truck stop buying food; however, rather than call police to report the crime, Defendant "dumped her body" at the back of the truck stop.

We conclude that the evidence is sufficient to support Defendant's conviction for premeditated first degree murder. Defendant is not entitled to relief on this issue.

## XI. Consecutive sentencing

Defendant contends that the trial court erred by ordering Defendant's life sentence in this case to run consecutively to his sentence for his three convictions for solicitation to murder three potential witnesses. The trial court considered the presentence report and the testimony at trial in this case and the previous solicitation case and concluded that Defendant had little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. The trial court found that the length of the sentence was reasonably related to the seriousness of the offenses committed and was necessary to protect

the public.  The State asserts that the trial court's imposition of consecutive sentencing was proper.

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness.  *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute."  *Id*. at 709-10.  The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous.  Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Comments; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The determination of whether an offender should be sentenced to consecutive or concurrent sentences is within the sound discretion of the trial court.  *State v. Christopher M. Black*, No. M2010-02176-CCA-R3CD, 2011 WL 7562957, at * 5 (Tenn. Crim. App. Dec. 13, 2011), *perm. app. denied* (Tenn. May 16, 2012) (citing *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984).  Tennessee Code Annotated section 40-35-115, in relevant part, permits the trial court to order consecutive sentencing if it finds by a preponderance of the evidence that the defendant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high."  Tenn. Code Ann. § 40-35-115(b)(4) (2006).

At the sentencing hearing, the State introduced the presentence report and offered no additional proof.  At the conclusion of the sentencing hearing, the trial court found that Defendant had prior convictions for solicitation to commit murder.  The court considered evidence presented at both trials.  The court found that Defendant was a dangerous offender whose behavior indicated little or no regard for human life.

As in this case, if a trial court rests its determination of consecutive sentencing on the basis of a defendant's status as a "dangerous offender," the court must make two additional findings, as required by *State v. Wilkerson*, 905 S.W.2d at 938.  *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).  First, the trial court must find that an extended sentence is necessary to protect the public from further criminal conduct by the defendant, and, second, it must find consecutive sentencing to be reasonably related to the severity of the offenses.  *Wilkerson*, 905 S.W.2d at 939.   Moreover, trial courts must make specific findings regarding these factors before imposing consecutive sentences.  *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

The trial court found that Defendant killed the victim and left her body "under the circumstances that we heard about." The court also noted what Defendant's employer testified that Defendant said "he would do to [prostitutes]." The court considered evidence in the solicitation case that Defendant said, "there's nothing a few dead detectives wouldn't cure" and that he agreed with McLaughlin's plan to blow up Ms. Young's trailer in a gas explosion. The court found that Defendant's conduct in soliciting the murders of potential witnesses "goes to the very heart of the judicial process, in terms of letting justice be done by your side testifying, the other side testifying, and a jury determining the outcome after hearing all of the witnesses." Based on those considerations, the trial court concluded that Defendant was a dangerous offender whose behavior indicated little or no regard for human life and that consecutive sentencing was warranted because "the public needs protecting . . . ." The court also found that if the sentences were not ordered to run consecutively to each other, it would "reduce the significance of both of the offenses."

We conclude that the record supports the trial court's findings, and the trial court sufficiently stated its findings on the record. The proof presented at both trials established that Defendant showed little regard for human life and no hesitation about committing a crime in which the risk to human life was high. Defendant disposed of the victim's nude and mutilated body at the back of a truck stop after he murdered her. Defendant casually told his employer, referring to prostitutes, "I just shoot them." Defendant solicited the murders of three people whom he alleged committed the murder and whom he believed would testify against him at trial. The proof establishes that Defendant had no hesitation about committing a crime in which the risk to human life was high. The trial court's imposition of consecutive sentences was proper. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE